IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAGEBRUSH HEALTH SERVICES,<br><br>  Plaintiff,<br><br>v.<br><br>DOROTHY FINK, Acting Secretary of Health and Human Services, et al.,<br><br>  Defendants. | Civil Action No. 25-127 (JEB) |

## SUPPLEMENTAL DECLARATION OF GURU CHARAN

I, Guru Charan, declare as follows:

1. I am the Chief Executive Officer and Co-Founder of Sagebrush Health Services. Unless stated on information and belief, I have personal knowledge of the facts set forth herein, and if called upon and sworn as a witness, I could and would testify competently thereto. This declaration is submitted to update the Court since the filing of my original Declaration.

2. Sagebrush was a covered entity in the 340B Program in the last uncontested status that preceded the filing of this lawsuit. Sagebrush itself operates twelve clinics in Nevada and Connecticut that employ or contract with ten physicians, fifteen nurse practitioners, and other clinical and administrative staff. Those clinics were participating as covered sites as part of the 340B Program. Despite this Court's Order of January 17, 2025 granting an Administrative Stay to preserve the status quo and the Court's Order to Show Cause in which the Court stated that it appeared Defendants were in violation of the Administrative Stay, the Sagebrush clinics have not been allowed to purchase drugs through the 340B Program since January 14, 2025.

3. Sagebrush serves approximately 10,000 patients, about a third of whom are uninsured, underinsured, and unable to pay for their medical care. As a non-profit, Sagebrush is required to provide medical care to its patients irrespective of their ability to pay. These uninsured patients are typically those who are homeless, suffering from mental illness, or suffering from addiction to drugs or alcohol or a combination of one or more of these conditions.

4. Of Sagebrush's approximately 10,000 patients, about 4,000 patients are suffering from chronic medical conditions that require on-site administration of drugs that must be supervised by a medical professional. In other words, these are not patients that can simply receive a prescription and obtain their medications from a pharmacy.

5. Sagebrush's drug procurement strategy is tailored to the unique medical needs of each patient. While Sagebrush uses the 340B Program to purchase eligible prescription drugs through wholesalers, it also sources non-340B medications through the same companies. Sagebrush's participation in the 340B Program is pivotal in enabling it to serve uninsured patients. The savings generated through this program effectively compensate for the losses incurred by serving uninsured patients and their inability to make timely payments.

6. Due to the significant cost of medications, Sagebrush's inventory program is designed to maintain a short shelf life for most medications while ensuring a sufficient supply to meet the needs of its patients. Sagebrush typically purchases drugs three times per week.

7. When Sagebrush provides medical services to an insured patient, reimbursement is typically received within thirty to forty-five days of the service date. Conversely, when Sagebrush purchases medications, whether through the 340B Program or otherwise, payment is usually due to the wholesalers within fifteen days of receipt of the medications.

8. Without access to the 340B Program, Sagebrush has been unable to procure any prescription medications under any conditions for our patients due to the wholesalers' refusal to sell drugs even at full price on customary credit terms. This refusal is a direct consequence of Defendants' actions in publishing materials on the HRSA website regarding the termination of our 340B certification and subsequently removing our clinics from the list of approved 340B sites. Consequently, wholesalers have only offered drugs on a cash-on-delivery (COD) basis. The delay in receiving payment for our services has prevented us from meeting the current COD demand imposed by drug wholesalers. Without access to drugs through the 340B Program, Sagebrush has been unable to provide the comprehensive medical services necessary to meet the needs of our patients. Furthermore, without access to drugs through the 340B Program, our ability to operate and serve both insured and uninsured patients is severely compromised.

9. If our 4,000 patients currently receiving chronic on-site medication under medical supervision are required to seek alternative clinics and providers, many of these patients will be without their critical medical care for months. Nevada's clinic shortage exacerbates this issue, and I do not believe that these facilities have the capacity to accommodate all of our critical care patients even over a short period. That means that some patients may not receive medical attention this year.

10. Accordingly, if we are compelled to terminate our physicians and nurse practitioners, the providers will be unable to provide medical care to our current patients at other clinics or locations until they are credentialed at those locations and enrolled as network providers by the payors, a process that typically takes several months. Therefore, between the shortage of clinics and the delays inherent in credentialing medical professionals, patients will suffer, and their

health will be compromised—precisely the situation we attempted to address when establishing Sagebrush in the first place.

11.     Sagebrush is a non-profit foundation formed to serve the community, including those without paid access to medical care. Rajesh Sonani, MD and I were unsettled by the growing number of individuals shut out of the healthcare system, including minorities and people in rural areas. We were particularly concerned by Nevada, where 14% of the population live below the poverty line. The state was also ranked #35 in terms of health in 2019. Knowing that the low-income population often does not enjoy good health, we founded Sagebrush to bring excellent, affordable services to them and permanently turn the page on America's healthcare inequity. We are paid annual salaries of about $375,000 each, and other than our salaries, we do not receive income from the operations of Sagebrush. If Sagebrush has any excess revenues, they are kept in the organization to help it to grow.

12.     Unless the current status quo is restored and Sagebrush is permitted to participate in the 340B Program, we will be compelled to discontinue providing care to at least a majority of our critically ill patients. Consequently, we will be forced to release a significant portion of our medical staff in early February. Furthermore, we will be unable to continue serving the uninsured community as we have, as our participation in the 340B Program is essential for the viability of this segment of our practice. This action will place this vulnerable group of patients at a substantial risk of adverse health outcomes or even life-threatening conditions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 30, 2025, at Las Vegas, Nevada.

							_____
							Guru Charan
							Chief Executive Officer and Co-Founder
							Sagebrush Health Services